IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs December 6, 2013

IN RE RAMON E. A. V.,[1] ET AL.

Appeal from the Juvenile Court for Hamblen County
No. 16200J, 15058J, 15422J, 15421J     A. Benjamin Strand, Jr., Sp. Judge[2]

No. E2013-01562-COA-R3-PT-FILED-FEBRUARY 25, 2014

This is a termination of parental rights case. Following a hearing, the trial court found clear and convincing evidence existed to support the termination of the father's parental rights on the statutory grounds of (1) abandonment due to failure to visit and (2) failure to comply substantially with the permanency plan. The trial court further concluded that clear and convincing evidence revealed that termination was in the best interest of the children. The father appeals. We affirm the decision of the trial court.

Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court
Affirmed; Case Remanded

JOHN W. MCCLARTY, J., delivered the opinion of the Court, in which CHARLES D. SUSANO, JR., P.J., and THOMAS. R. FRIERSON, II, J., joined.

Gerald T. Eidson, Rogersville, Tennessee, for the appellant, Ramon A. V.

Robert E. Cooper, Jr., Attorney General and Reporter, and Alexander S. Rieger, Assistant Attorney General, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services.

Dawn Coppock, Strawberry Plains, Tennessee, for the appellees, Richard and Tami A.

Charity Miles Williams, Knoxville, Tennessee, guardian ad litem.

---

[1]To protect the identity of children in parental rights termination cases, we use initials instead of the last names of the parties.

[2]Sitting by interchange.

## OPINION

## I. BACKGROUND

By the time Damonica L. T. ("Mother")[3] was nineteen years old, her relationship with Ramon A. V. ("Father"), a man twice her age, had begun. Infidelity and domestic violence characterized their relationship.[4] Father was "a regular cocaine user," and he and Mother would "smoke weed together and stuff." Over the years, Father[5] and Mother had the following children together: Ramon E. A. V., Jr. (d.o.b. 5/14/2007), twins Buddy N. A. V. and Margarita L. A. V. (d.o.b. 3/23/2008), and Aida N. A. V. (d.o.b. 12/15/2009) (collectively, "the Children"). After the filing of the termination petition, Father and Mother gave birth to a fifth child, Abdiel A.V.

In March 2008, when DCS filed for temporary custody of young Ramon due to Mother's drug use, Father tested positive for cocaine and was not allowed to take custody of the child. Ultimately, Ramon was returned to Mother. When twins Margarita and Buddy were born, DCS petitioned for custody based upon their low birth weights resulting from Mother's drug abuse. Mother was permitted to retain physical custody of the Children conditioned upon a trial home visit. Again, Father could not assume custody of the Children because he still was abusing drugs. When all four children eventually came into state custody in February 2010, once again Father was unable to take the Children because of his drug use. On October 5, 2010, the juvenile court determined that the Children were dependent and neglected based in part upon Father's drug abuse. By Father's own admission, he has been using drugs since he was seven years old.

During the fifteen months prior to the termination hearing, Father twice tested positive for drugs on DCS drug screens. Prior to that time, Father tested positive on June 6, 2007, for cocaine, methamphetamine, marijuana, and benzodiazepines after informing the juvenile court that "he may test positive for cocaine and marijuana because he had used both substances within the past 48 hours." Despite this admission, Father later told the court "that he disputes the positive drug screen." Father tested positive for marijuana and cocaine on February 20, 2010, and stipulated to marijuana use and "snorting cocaine," but not "smoking crack cocaine" on February 24, 2010. The juvenile court, as part of the dependency and neglect process, found ongoing cocaine and marijuana abuse.

---

[3]Mother surrendered her parental rights on April 16, 2013.

[4]"[H]e would smack me."

[5]Father had two children living in Pennsylvania from a previous relationship.

On November 1, 2010, Father again tested positive for cocaine and benzodiazepines. At a permanency plan hearing on March 16, 2011, he tested positive for cocaine when screened at the courthouse. At a hearing on November 2, 2011, Father apparently stated that he would test positive for pain medication for which he did not have a prescription. At an April 25, 2012 hearing, Father admitted that he was a cocaine addict and had used cocaine as recently as January 25, 2012, and marijuana as recently as February 12, 2012. He also admitted that he had declined to take a drug screen on February 15, 2012, because he believed he would test positive.

After the filing of the termination petition on February 9, 2012, Father apparently decided to comply with the permanency plan and address his drug use. He observed that previously, he "didn't care [about] getting off drugs because every time the kids got t[a]ken away, they were right back to their mama. That's why I didn't care."

Mother related during her testimony that Father had been imprisoned in Puerto Rico for a time and had been arrested for disorderly conduct and resisting arrest. Father also has been cited repeatedly for driving without a driver's license. An order of protection was issued against him for alleged domestic violence against the girlfriend with whom he spends time when he is not with Mother. At trial, Father admitted, "[o]h, yeah, I have, I have hit a woman."

Since Spring 2010, the Children have been placed with Tami and Richard A. ("Foster Parents"). Tami ("Foster Mother") confirmed that Ramon, Buddy, and Margarita have special medical needs related to ADHD and sickle cell anemia. Medical appointments are numerous and the home life for the Children must be very structured. When the Children first came into custody, their developmental ages lagged behind those of comparable children. They had limited vocabularies and largely communicated with hand gestures. Additionally, they were underfed. After being nurtured for years by the foster family, the Children are thriving. Foster Mother confirmed that she has devoted her life to the Children. She testified that the foster family's older children "all love the younger children . . . and we just all work well together." Foster Mother related that she and her husband also love the Children and intend to adopt all of them, including the younger child born after the filing of the termination petition. She noted that her family "want[s] to keep them together. That's very important to us." The CASA report revealed that "all 4 children display love for each other and a very strong bond with their foster family whom they have been a part of for 26 months." Even Father acknowledged that the Children had developed a bond with the foster family.

During the years in which the Children were being cared for by Foster Parents, Father declined to visit them and did not attempt to get custody. According to Father, he did not

visit because he "couldn't pass a drug screen." When visits resumed after the filing of the termination petition, DCS observed that the Children enjoyed spending time and playing with Father, but when he leaves after his visits, "it's not like they're screaming to stay" with him.

According to Dr. Miriam Weinstein, a pediatric rehabilitation developmental specialist, if children are removed from their home into a foster home for a significant period of time and then returned much later to their parents, "[i]t has a very dramatic impact to children. It makes them feel very insecure. If they love and bond with the new family, then they're more scared than ever that this precious thing could be taken away. If you disrupt that then they may never trust again." Per Dr. Weinstein, Foster Mother seemed very competent in her care for the Children. In contrast, she stated that Father's style on the parenting scale was "permissive and that could really be very damaging to a child." Dr. Weinstein opined that the Children need consistency, borders, and limits. She observed that Dr. William A. McGillivray, Father's clinical psychologist, described Father as an "avoidant-style parent," so much so that "he's not going to anticipate problems and try to intervene to prevent them." Dr. Weinstein further expressed concern with Father's history of domestic violence. She believed that returning the Children to either of the parents "would be destructive to the children." She determined that the relationship with the foster family was "crucial to each child, very, very important to them."

Trial in this matter was held on May 23, 2013, and an order terminating Father's parental rights was filed on August 13, 2013. The trial court's findings provided inter alia as follows:

> At the time of trial, the [C]hildren had been continuously in foster care for three years and three months. At the time of the filing of the termination of parental rights action on February 9th, 2012, [Father] had not visited with the [C]hildren at all since July of 2010, over a year and a half. . . . Subsequent to the filing of the termination action, [Father] has visited with the [C]hildren fairly regularly.
>
> * * *
>
> Mother and [F]ather currently live together in public housing. [M]other added [F]ather to her lease in June of 2012. Mother testified that [F]ather did not actually live with her prior to June, 2012 in violation of the housing authority lease, but only came over and spent days at a time when "she needed sex." Mother testified that during these times [F]ather cared for the [C]hildren, even though he admitted that he was a heavy cocaine user during that time.

-4-

. . . The Court entered an order in September of 2010, after the [C]hildren had been in care for over six months, which suspended [F]ather's visitation until he could produce a negative drug screen for cocaine. Father does not dispute that he was using cocaine at the time and continued to do so until some time after the action for termination of parental rights was filed; although there is some dispute about exactly when he stopped using cocaine. Nor does [Father] dispute that he was aware of the court's order requiring a clean drug screen to visit. Father does not dispute the validity of the DCS drug screens, which showed a positive cocaine result during this time; nor does [F]ather dispute that he chose to use cocaine and forego visitation with [the C]hildren. It was not until after the filing of the termination of parental rights action - some 19 months after the court's visitation order that [Father] produced a clean drug screen and sought visitation with [the C]hildren.

Mother testified that [F]ather had not used cocaine for at least 8 months and held steadfast to this timeline of cocaine use that included use after the birth of their last child, Abdeil, in May, 2012. [F]ather claimed a longer period of abstinence. Despite the valiant effort by [F]ather's counsel to "refresh" [M]other's memory otherwise, [M]other continued to testify that he had only ended his regular use of cocaine about 8 months before trial. Mother and [F]ather's testimony leads the court to conclude that [F]ather continued to use cocaine at least until late summer, 2012.

[F]ather exercised visitation with [the C]hildren regularly after the filing of the termination of parental rights action. However, FSW[6] Courtney Sweet testified that [F]ather's last visit, which occurred a few days before trial, revealed a frustrated father. He visited with all five of [the C]hildren for four hours, without [M]other present, as [M]other had surrendered her rights. The visit appeared less than successful to Ms. Sweet.

Father signed the Criteria for Termination of Parental Rights provided by DCS in November, 2010 and FSW Courtney Sweet testified that she verbally explained the criterion to [F]ather and that he understood the ramifications of failing to visit. FSW Sweet also testified that the Juvenile Court judge explained the criteria for termination of parental rights to [F]ather at least once at the initial permanency plan ratification. Father did not dispute that he was aware that abandonment of [the C]hildren was a ground for termination of his parental rights. Father asks for "another chance" stating that he knows he can

---

[6]"FSW" denotes "foster care social worker."

be a good parent because he is now not the addict that he was before.

DCS developed four permanency plans[7] after the [C]hildren came into foster care on February 24th, 2010. The requirements of the plans for [F]ather included, but were not limited to, parenting classes, an alcohol and drug assessment and treatment, following all resulting recommendations, maintaining stable housing and employment. Upon learning of domestic violence between [M]other and [F]ather, anger management and domestic violence classes were added to the plans by the court. As noted in the CASA report of August 18, 2010, [F]ather could not be persuaded to complete any steps on his permanency plan. Father admitted that he did nothing initially except possibly an assessment for alcohol and drugs, but then testified that he completed his requirements in less than 3 months after the state filed for termination.

Each of the [C]hildren came into foster care in a poor physical condition and the [C]hildren continue to experience difficulties. While Margarita's broken leg and the parents' drug use are the direct reasons that the [C]hildren came into care, the indirect results of long-term, dangerously poor parenting was evident from testimony. The [F]oster [M]other testified that upon coming into her home the [C]hildren were malnourished and significantly behind in their developmental milestones. The [C]hildren were not accustomed to eating regularly or feeding themselves. The oldest child, Ramon, was 3 years old at the time of custody and had significant dental decay that required admission to Children's Hospital on an outpatient basis to have repair.

Father was unable to identify any of the [C]hildren's medical diagnoses, conditions or problematic behaviors, admitting that he had failed to attend medical appointments for the [C]hildren. Father blamed DCS for his failure to attend, stating that DCS only notified [M]other of happenings in the case. The Court finds that [F]ather was present at permanency planning meetings and court appearances where the [C]hildren's needs and various appointments were discussed. He knew who the caseworkers were and how to reach them. The record is void of any request by [F]ather for more information or any complaint lodged by [F]ather prior to the trial about not being sufficiently advised. Thus the Court attributes his lack of knowledge to his lack of interest

---

[7]The first permanency plan developed by DCS is presented as separate plans for each child, while subsequent plans are presented as a family plan with all the Children on one plan. Thus, there are four separate permanency planning events of record.

and his failure to appreciate the severity of the [C]hildren's needs.

[M]other testified in the termination matter, although she was no longer a party to the action. Mother initially appeared impaired at trial and admitted to taking a Xanax at about 4:30 a.m., but denied any other drug use prior to testifying. She testified that her disheveled appearance and red eyes were related to her tearfulness about the situation. Mother admitted that she had smoked marijuana three days prior to testifying and also that she used marijuana in the home she shared with [F]ather. [M]other acknowledged that she had relapsed in her drug recovery. Mother has a prescription for Xanax, per her testimony. While [M]other was at times . . . combative and disrespectful, she did not appear to be unable to understand questions or form answers and she did not appear incapable of understanding the oath. At times, she candidly assessed her own shortcomings but was unwilling to place any responsibility on [F]ather. Both parents appeared to believe that i[t] was primarily [M]other's responsibility to attend to the needs of the [C]hildren before the [C]hildren came into DCS custody and later it was her responsibility to get the [C]hildren back from DCS. Both parents placed the blame on [M]other for [F]ather facing a termination of parental rights.

Father failed a DCS drug screen for marijuana in August of 2012, which he disputed. He claimed that he obtained a second drug screen sometime later with a negative result. [F]ather also failed a DCS drug screen on April 9, 2013 for marijuana and benzodiazepines. He testified that he was unable to afford the $50.00 for a second drug screen, so he went to the hospital and lied about his condition in order to obtain a "free" drug screen. That screen showed negative for all substances. The Court notes Father's lie to medical personnel for his own gain.

On April 10, 2013, [F]ather again tested positive for marijuana and benzodiazepine on another unscheduled DCS drug screen. [Father] testified that he obtained a second drug screen from New Hope but admitted that even that drug screen showed positive for benzodiazepine. He did not explain that positive test and he did not retest. Father admitted that DCS offered to pay for a hair follicle drug screen on April 10, 2013 in an effort to allow him to prove he was not using drugs, but he declined.

Mother, not [F]ather, had a prescription for benzodiazepine. Father continued to testify he had not taken drugs, despite the positive drug screens from DCS and other entities. Father had not been to aftercare treatment for over a month

at the time of the positive drug screens, but denied that he relapsed. Drug screens can be inaccurate, however, [F]ather's positive screen for benzodiazepines on a subsequent screen from his own aftercare provider, coupled with the evidence that [M]other is prescribed benzodiazepine leads the Court to conclude that [F]ather is abusing [M]other's medication. In addition, [M]other testified that she is the "hook-up" for marijuana and th[at] she is the one with the "connections" to obtain the illegal drugs. Mother admits to using marijuana in the parties' home and [F]ather has also tested positive for marijuana. The Court finds that [F]ather is also using marijuana.

Father tested negative for all substances on the day of trial and [M]other tested positive for marijuana and benzodiazepines, which was consistent with her testimony. The Court finds from all of the evidence that while [F]ather may have gone through classes pertaining to drug treatment, he has not discontinued his illegal drug use.

Further, [F]ather resides with [M]other who admittedly has "relapsed." Father could offer the court no plan as to how he would take care of the [C]hildren if he were permitted to take them home the day of trial, except for a proposed babysitter for whom he could not provide a last name. While [M]other offered to leave the family home, albeit by shouting out during [F]ather's testimony, [F]ather testified that the housing authority lease is in [M]other's name. Father testified he has no driver's license and that he didn't think "anything about it" even though he was cited the prior month while driving [M]other's car, for driving on a suspended license. He testified this type of citation usually costs $200.00 in court costs and fines. Father testified he would take public transportation, if necessary, to get the [C]hildren about. Father testified that all the [C]hildren need is love and attention.

[F]ather has not made adjustments to his circumstance to make it safe for the [C]hildren to come home. At the time of trial, [F]ather still abused drugs and lived with [M]other who abused drugs. While the court finds that the [C]hildren are familiar with [F]ather and may enjoy [F]ather as a playmate, he does not have a meaningful parental bond with the [C]hildren. . . .

Miriam Weinstein, medical doctor and pediatric rehabilitation developmental specialist and expert in neonatal abstinence syndrome, treated Buddy and Margarita . . . , reviewed a number of records regarding the [C]hildren and parents and testified by deposition. The court found Dr. Weinstein's testimony to be credible and particularly helpful in determining the special needs and

best interest of the [C]hildren.

Dr. Miriam Weinstein testified as an expert about the effects of intra uterine drug exposure. Mother admitted that 3 of the 4 children were drug exposed, with only the youngest Aida not being exposed to drugs. The Court would note that [F]oster [M]other testified that Aida has the "fewest" problems. Dr. Weinstein testified that Buddy and Margarita show signs o[f] drug exposure . . . in utero and resulting [in] long-term impairment. As drug exposed children, Buddy and Margarita need a caregiver with a great deal of insight, perception, patience and willingness to make extra effort beyond that necessary to successfully parent children without long-term impacts from drug exposure. To be successful these children need strong limits and consistency and parents willing to "be the boss."

A parenting assessment of [F]ather found him to use an avoidant style of parenting. [Father]'s psychological assessment found him to be opportunistic with significant antisocial tendencies. With this information and her assessment of the [C]hildren Dr. Weinstein predicted [F]ather's frustration with visits, which was later observed by Ms. Sweet. Dr. Weinstein also testified that in light of his psychological traits, history of domestic violence, and drug abuse and the frustration he can be expected to experience with four, young, special needs children, [Father] was unlikely to be able to keep the [C]hildren physically safe or to provide the highly structured life that is essential for the [C]hildren to feel emotionally safe and to thrive.

Dr. Weinstein noted fear of abandonment in the [C]hildren typical of those with many disruptions in their lives. She expressed grave concerns about the affect of addition[al] disruptions on the [C]hildren's mental health even if the [C]hildren were to move from one good caretaker to another. She described the bond that she witnessed between Buddy and Margarita and Ms. A[.] as "crucial" to the [C]hildren. Dr. Weinstein opined that for children so damaged, to disrupt a strong and longstanding bond with parental figures would permanently damage the [C]hildren. Damage could include reactive attachment disorder that could inhibit development of healthy adult relationships. Disruption could also be expected to cause the [C]hildren to substantially regress in their progress since removal. The Court finds that returning [the C]hildren to . . . [F]ather would be catastrophic. The Court notes that the bond with the [foster family] formed while [F]ather was, by choice using cocaine instead of visiting with [the C]hildren and working his foster care plan.

Foster mother, Tammy A[.] testified that upon initially coming into the A[.] home, the four children together had about seventeen visits to various professionals a week to address their physical and emotional health and delays. Now the [C]hildren are much improved and have fewer appointments but are still receiving multiple treatments. Ms. A[.] testified that she and her husband and their older children had strongly bonded with the [C]hildren and wanted them to be a permanent part of their family.

This Court finds that in spite of treatment, [Father] remains either addicted to drugs or persists in the recreational use of drugs with [M]other. He has tested positive for benzodiazepine at least twice since he completed treatment and claimed to have overcome his addiction. While this court believes that [F]ather is sincere in his confidence in his ability to parent, he does not fully appreciate what parenting his or any children requires or that drug use is only part of his shortcomings. Further, he fails to recognize the impact of his delay in developing an interest in parenting [the C]hildren.

It is uncontroverted that [F]ather willfully failed to visit prior to the filing of the termination action. By his testimony his continued cocaine use was by choice. [Father] was aware of [M]other's problems. He knew that the [C]hildren had been removed from her care multiple times before this final custodial episode. He knew the consequences of failure to visit from at least November of 2010 when he signed the Criteria for Termination of Parental Rights which was presented and explained to him by FSW Sweet. [Father] admits that [the C]hildren are bonded to their foster family but said he believes that "they will be okay" after time. The Court finds that [F]ather has extremely limited insight into the needs of any child, much less his particular children who have special needs and are successfully settled in another home.

## CONCLUSIONS OF LAW

The State has proven two grounds for termination of the parental rights of [Father] by clear and convincing evidence with respect to his four children [ ] Ramon E. A. V., Buddy N. A. V., Margarita L. A. V., and Aida N. A. V. Those grounds are abandonment by failure to visit and substantial noncompliance with permanency plan. There is overwhelming proof that [Father] did not visit [the C]hildren at all from late 2010 to post filing of the termination of parental rights. There is also overwhelming evidence that the reason for both failures was his voluntary abuse of cocaine and his unreasonable delegation of his parental responsibilities to [M]other who also

-10-

abused drugs and who also had a poor parental track record.

It is clear that when properly motivated, [Father] can attend visits and work on his plan. [Father]'s eleventh hour efforts, pointed out that the impediment was willingness, not understanding of what was required or any external barrier to performance. It is unclear whether he has the insight and temperament to ever become a safe placement for four young children with special needs, but that question is no longer pertinent. Due to his permitting grounds to manifest, delay and the bonds formed over a period of years between the [F]oster [P]arents and the [C]hildren, the State appropriately filed for termination.

He never formed a relationship with the [C]hildren that was any more meaningful than playmate and he did not demonstrate that he could safely and consistently supervise and care for the [C]hildren. [Father]'s efforts were too little and far too late. This court finds by clear and convincing evidence that termination of [Father]'s parental rights is in the best interest of the subject [C]hildren.

* * *

. . . [Father] did fail to visit during the relevant four month period and also had notice of the criteria for Termination of Parental Rights that exceeded the notice legally required.

. . . [Father]'s abandonment was willful as not only did he choose to continue his cocaine use, but he failed to make any effort to modify his circumstance until after termination was filed.

. . . [Father] knew the contents of his permanency plan admittedly by his own testimony at trial. The problems in the home, the serious and mysterious injury of Margarita, drug abuse by both parents, economic and relationship instability, weak parenting skills, domestic violence by the father, malnutrition, dental decay and developmental delays of the [C]hildren, correlate well to the plan's requirements. The plan was modified and tailored to the family's needs, with domestic violence counseling offered when it was discovered that [Father] was physically abusive to [M]other. Father did not dispute that the reasonableness of the plan, no[r] did he dispute that he was aware of all of his requirements.

. . . This court is concerned about [F]ather's inability to recognize and

appreciate the needs of [the C]hildren. It is reasonable to expect that in the care of a parent who is oblivious to the [C]hildren's needs, the improvement in their physical and mental health and educational strides would be reversed. Based upon the statutory factors, and the testimony of Dr. Weinstein and the dramatic improvement in the physical and mental health of the [C]hildren precipitated primarily by changing the [C]hildren's caretakers and getting them appropriate services, the continued criminal activity in the home, absence of a meaningful relationship between [F]ather and the [C]hildren, the lack of meaningful change and the [C]hildren's need to integrate into a permanent home, the Court finds that the termination of [Father]'s parental rights is in the best interest of the [C]hildren.

(Numbering in original omitted).

Father filed a timely notice of appeal.

## II. ISSUE

The issue presented by Father on appeal is whether the trial court properly determined that the termination of his parental rights was in the best interest of the Children.

## III. STANDARD OF REVIEW

Parents have a fundamental right to the care, custody, and control of their children. *Stanley v. Illinois*, 405 U.S. 645 (1972); *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988). This right "is among the oldest of the judicially recognized liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re M.J.B.*, 140 S.W.3d 643, 652-53 (Tenn. Ct. App. 2004). "Termination of a person's rights as a parent is a grave and final decision, irrevocably altering the lives of the parent and child involved and 'severing forever all legal rights and obligations' of the parent." *Means v. Ashby*, 130 S.W.3d 48, 54 (Tenn. Ct. App. 2003) (quoting Tenn. Code Ann. § 36-1-113(I)(1)). "'[F]ew consequences of judicial action are so grave as the severance of natural family ties.'" *M.L.B. v. S.L.J.*, 519 U.S. 102, 119 (1996) (quoting *Santosky v. Kramer*, 455 U.S. 745, 787 (1982)).

While parental rights are superior to the claims of other persons and the government, they are not absolute and may be terminated upon appropriate statutory grounds. *See Blair v. Badenhope*, 77 S.W.3d 137, 141 (Tenn. 2002). Due process requires clear and convincing evidence of the existence of the grounds for termination of the parent-child relationship. *In*

*re Drinnon*, 776 S.W.2d at 97. "[A] court must determine that clear and convincing evidence proves not only that statutory grounds exist [for termination] but also that termination is in the child's best interest." *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). The existence of at least one statutory basis for termination of parental rights will support the trial court's decision to terminate those rights. *In re C.W.W.*, 37 S.W.3d 467, 473 (Tenn. Ct. App. 2000), abrogated on other grounds by *In re Audrey S.*, 182 S.W.3d 838 (Tenn. Ct. App. 2005).

The heightened burden of proof in parental rights termination cases minimizes the risk of erroneous decisions. *In re C.W.W.*, 37 S.W.3d at 474; *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable. *State v. Demarr*, No. M2002-02603-COA-R3-JV, 2003 WL 21946726, at *9 (Tenn. Ct. App. Aug. 13, 2003). This evidence also eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence. *In re Valentine*, 79 S.W.3d at 546; *In re S.M.*, 149 S.W.3d 632, 639 (Tenn. Ct. App. 2004); *In re J.J.C.*, 148 S.W.3d 919, 925 (Tenn. Ct. App. 2004). It produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established. *In re A.D.A.*, 84 S.W.3d 592, 596 (Tenn. Ct. App. 2002); *Ray v. Ray*, 83 S.W.3d 726, 733 (Tenn. Ct. App. 2001); *In re C.W.W.*, 37 S.W.3d at 474.

The Tennessee Supreme Court has provided guidance in reviewing cases involving the termination of parental rights:

> A reviewing court must review the trial court's findings of fact de novo with a presumption of correctness under [Rule 13(d) of the Tennessee Rules of Appellate Procedure]. *See In re Adoption of A.M.H.*, 215 S.W.3d [793,] 809 [(Tenn. 2007)]. In light of the heightened burden of proof in proceedings under [Tennessee Code Annotated section] 36-1-113, *the reviewing court must then make its own determination regarding whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, provide clear and convincing evidence that supports all the elements of the termination claim.* *State Dep't of Children's Servs. v. Mims*, 285 S.W.3d [435,] 447-48 [(Tenn. Ct. App. 2008)]; *In re Giorgianna H.*, 205 S.W.3d 508, 516 (Tenn. Ct. App. 2006); *In re S.M.*, 149 S.W.3d 632, 640 n. 13 (Tenn. Ct. App. 2004). Appellate courts conduct a de novo review of the trial court's decisions regarding questions of law in termination proceedings. However, these decisions, unlike the trial court's findings of fact, are not presumed to be correct. *In re Angela E.*, 303 S.W.3d [240,] 246 [(Tenn. 2010) ]; *In re Adoption of A.M.H.*, 215 S.W.3d at 809.

*In re Bernard T.*, 319 S.W.3d 586, 596-97 (Tenn. 2010) (emphasis added).

## IV. DISCUSSION

Tennessee Code Annotated section 36-1-113 provides the grounds for termination of parental rights.  The applicable provisions read as follows:

> **36-1-113.  Termination of parental rights.** – (a) The chancery and circuit courts shall have concurrent jurisdiction with the juvenile court to terminate parental or guardianship rights to a child in a separate proceeding, or as a part of any grounds for termination of parental or guardianship rights permitted in this part or in title 37, chapter 1, part 1 and title 37, chapter 2, part 4.
>
> * * *
>
> (c) Termination of parental or guardianship rights must be based upon:
>
>> (1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and
>>
>> (2) That termination of the parent's or guardian's rights is in the best interests of the child.
>
> * * *
>
> (g)  Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g) . . . :
>
>> (1)  Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred;
>>
>> (2)  There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan pursuant to the provisions of title 37, chapter 2, part 4 . . . .

Tenn. Code Ann. § 36-1-113(a)-(g)(1) & (2).

Father does not challenge the determination that grounds existed to terminate his parental rights.  We find that clear and convincing proof exists in the record that for nearly

a year and a half, Father willfully did not bother to visit the Children. Additionally, the record reflects that Father made no attempt whatsoever to comply with the permanency plans prior to the filing of the termination petition because he "didn't care." DCS demonstrated that the requirements of the plans were reasonable and related to remedying the conditions that initially led to the removal of the Children. There was clear and convincing evidence of Father's substantial noncompliance. Accordingly, the trial court did not err in finding that grounds existed to terminate Father's parental rights.

## B. BEST INTEREST

Having concluded that there was clear and convincing evidence supporting the statutory grounds to terminate Father's parental rights, we must consider whether termination of Father's parental rights was in the best interest of the Children. In making this determination, we are guided by the non-exhaustive list of factors provided in Tennessee Code Annotated section 36-1-113:

(i) In determining whether termination of parental or guardianship rights is in the best interest of the child . . . the court shall consider, but is not limited to, the following:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

-15-

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to [section] 36–5–101.

Tenn. Code Ann. § 36-1-113(i) (Supp. 2012). "This list is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's parental rights is in the best interest of a child." *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). The General Assembly has also stated that "when the best interest[ ] of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interest[ ] of the child, which interests are hereby recognized as constitutionally protected." Tenn. Code Ann. § 36-1-101(d); *see also White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004) (holding that when considering a child's best interest, the court must take the child's perspective, rather than the parent's).

Father challenges the determination that termination of his parental rights is in the best interest of the Children. He contends that his "progress in addressing the issues that brought the [C]hild[ren] into custody should be considered." Father notes the following accomplishments: (a) he has a residence; (b) he has consistently paid child support; (c) he has an extensive work history; (d) he completed his alcohol and drug assessment, anger management, parenting, and domestic violence classes within three months of the filing of the termination petition; (e) he completed an outpatient drug program; and (f) he attended a meeting for a psychological evaluation.

Contrary to the position of Father, the proof clearly and convincingly reveals that termination of Father's parental rights was in the best interest of the Children. At the time of trial, Father was unemployed and living with Mother, despite the fact that Mother had surrendered her rights and the Children could not reside with her. Father admitted that he had done nothing since the Children were born to provide them with a suitable home. He made no effort to remedy his drug problem until the termination petition was filed. Thereafter, he still failed three drug screens. Accordingly, Father has failed to make a lasting adjustment of circumstances despite DCS's efforts to assist him. *See* Tenn. Code Ann. § 36-1-113(i)(1) & (2). Additionally, Father has failed to maintain regular visitation and contact with the Children. *See* Tenn. Code Ann. § 36-1-113(i)(3). Due to the lack of visitation between Father and the Children, the parent-child relationship has eroded. Father acknowledged that "[i]t's like I don't exist for these kids." *See* Tenn. Code Ann. § 36-1-113(i)(4).

The Children are thriving in the Foster Parents' home. After being nurtured for years by the foster family, the Children are performing "above and beyond." Dr. Weinstein's assessment addresses the problems a return of the Children to Father might create:

> Do the children feel the same degree of bondedness back [to the biological parents], I would doubt that because these parents have not been the primary caregivers for these children for a long, long time and as I've described, it's the difference between, say, a grandparent who has visits and someone who's doing daily care.

\* \* \*

> I can say with a high degree of medical certainty if these children went back [to the biological parents], their degree of bonding would not be sufficient to overcome years of having been in a different home.

\* \* \*

> [T]hree years in one home is long enough that these children are set in concrete and that ripping them up would be very destructive.

*See* Tenn. Code Ann. § 36-1-113(i)(5).

In consideration of all of the foregoing factors, the trial court correctly concluded that the termination of Father's parental rights is in the Children's best interest. The record demonstrates that the Children have become attached to the Foster Parents and are fully

integrated into the pre-adoptive home.  A change in caretakers and physical home environment likely would have an adverse effect on their well being.  We therefore concur in the view of the trial court that awarding custody to Father would be contrary to the Children's best interest.

## V.  CONCLUSION

We affirm the trial court's order terminating the parental rights of Father to Ramon E. A. V., Jr., Buddy N. A. V., Margarita L. A. V., and Aida N. A. V.  The costs of the appeal are assessed to Father, Ramon A. V.

_____
JOHN W. McCLARTY, JUDGE